DEAN R. SIDOWSKI,     :
   Plaintiff,      :
            :
v.           :   CIVIL ACTION NO.
            :   3:10-cv-00243 (VLB)
MICHAEL J. ASTRUE,    :
COMMISSIONER,     :
SOCIAL SECURITY ADMINISTRATION, :
   Defendant.     :   December 7, 2010

## MEMORANDUM OF DECISION DENYING
## PLAINTIFF'S MOTION TO REVERSE AND TO REMAND
## AND GRANTING DEFENDANT'S MOTION TO AFFIRM [Docs. #13, 18]

The plaintiff, Dean R. Sidowski, filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final decision of the defendant, the Commissioner of Social Security, denying his application for supplemental security income, and asserting that the record lacks substantial evidence to support the Commissioner's findings and conclusions as required by law. The Commissioner's Decision Review Board had selected the plaintiff's claim for review but then notified him on December 22, 2009 that it had failed to complete its review of the decision of the Administrative Law Judge ("ALJ") within the required ninety days. [Tr. 1-3] The ALJ's decision thus became final pursuant to 20 C.F.R. § 405.420(a)(2).

The plaintiff has filed a motion to reverse the Commissioner's decision and to remand the case [Doc. #13], and the Commissioner has filed a motion to affirm [Doc. #18]. For the reasons given below, the plaintiff's motion to reverse and to

remand is DENIED, and the Commissioner's motion to affirm is GRANTED.

## I. <u>FACTUAL BACKGROUND</u>

The plaintiff was born in 1959 and attained only a seventh-grade education, dropping out of school at the age of 13.  [Tr. 36, 132, 141, 370]  His medical records begin at the age of 27, on September 28, 1986, when he struck a pole with his car while driving drunk.  [Tr. 186, 218, 363]  He was diagnosed with a traumatic brain injury, left leg fractures, and a ruptured diaphragm and spleen. [Tr. 363]  He was in a coma for two weeks and then had post-traumatic amnesia for four weeks.  [Tr. 363]  In November 1986, he was diagnosed with anemia, depression, and hypertension.  [Tr. 363]

The plaintiff was transferred to Gaylord Hospital in Wallingford, Connecticut on December 31, 1986.  [Tr. 364]  Dr. Joseph Belanger, a neuropsychologist at Gaylord, evaluated the plaintiff on January 23, 1987 and concluded that he had "mild diffuse neurological dysfunction throughout the cerebrum."  [Tr. 365]  Dr. Belanger also found that the plaintiff had an "impoverished fund of general knowledge about the world," poor vocabulary and attention to detail, no understanding of metaphor, no ability to sequence pictures by cause and effect or storyline, no ability to generate logical similarities, and difficulties in abstractly defining words, understanding analogies, and performing calculations.  [Tr. 365]  Dr. Belanger determined that these "relatively greater deficits in intellectual processes are probably not" related to the plaintiff's traumatic brain injury:  "Instead, they appear to reflect an innate endowment that

was less than generous." [Tr. 365] Dr. Belanger also opined: "There are trends in the data which are quite suggestive of an additional diagnosis in the realm of antisocial personality disorder . . . ." [Tr. 365] Dr. Belanger wrote that the plaintiff's prognosis was good: "The rate of his physical healing is almost certainly such that he would be able to resume unskilled labor within one year from the date of trauma. . . . He can be expected to become independent in self-care, to be able to maintain an independent residence, to resume such social functioning as he had, and to be able to engage in competitive gainful employment albeit at the lower end of the job market range." [Tr. 365]

A "family conference" regarding the plaintiff was held at Gaylord on February 4, 1987 and included all of the hospital staff involved in his treatment. Social worker Luke V. Lauretano completed a report following the conference, writing that the plaintiff had "no medical problems at this time" and was taking blood pressure medication and antidepressants. [Tr. 360] Lauretano reported that the plaintiff's "main problems are in the cognitive area and are concerned with memory, orientation to time, concentration and attention, organization, reasoning and judgment, problem solving and sequencing." [Tr. 360] Lauretano also noted that "there are many complaints from other patients and from visitors and staff regarding [the plaintiff's] abusive language and attitude. . . . [T]he head injury . . . is not causing any incompetence. A major part of [his] problems are . . . based on his pre-traumatic anti-social personality disorder which continues at this time." [Tr. 361] Lauretano explained that the plaintiff had "a great deal of

3

potential," but he "appears at this time not to be willing to avail himself of [vocational] opportunities." [Tr. 361]

The plaintiff was discharged from Gaylord on February 20, 1987. [Tr. 345-46] His antidepressants were discontinued because a psychiatric consultant determined there was no evidence of major depression. [Tr. 372] Lauretano commented on the plaintiff's discharge summary that his "failure to live up to his potential psychologically and emotionally is judged to be not the result of the head injury but the previously existing anti-social personality disorder." [Tr. 362] The record indicates that the plaintiff did not seek any further medical treatment until after he filed his application for supplemental security income on April 30, 2007. [Tr. 132]

## II. ADMINISTRATIVE PROCEEDINGS

The plaintiff alleged in his application that he became disabled on January 1, 2002, at age 42, but he did not specify a precipitating event. [Tr. 123] After the plaintiff's application was denied, he requested a hearing before an ALJ. [Tr. 85-86] On August 6, 2009, ALJ Henry J. Hogan held a hearing, which consisted of testimony by the plaintiff, his girlfriend, and a vocational expert. [Tr. 17-63] The ALJ then issued his decision on September 1, 2009, finding that the plaintiff was not disabled. [Tr. 4-16]

The ALJ applies a five-step sequential evaluation process to an application for supplemental security income. First, the ALJ determines whether the claimant is performing substantial gainful work activity. 20 C.F.R. § 416.920

(a)(4)(i).  If the claimant is not performing such activity, the ALJ proceeds to the second step to determine whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments.  § 416.920(a)(4)(ii).  The impairment must be expected to result in death or must last or be expected to last for a continuous period of at least twelve months.  § 416.909.  If the claimant has a severe impairment, the ALJ proceeds to the third step to determine whether the impairment meets or equals an impairment listed in appendix 1 of the applicable regulations.  § 416.920(a)(4)(iii).  If the claimant's impairment meets or equals a listed impairment, the claimant is disabled.

If the claimant does not have a listed impairment, the ALJ proceeds to the fourth step to determine whether the claimant has the residual functional capacity ("RFC"), remaining after his severe impairment, to perform his past relevant work.  § 416.920(a)(4)(iv).  RFC is defined as the most that a claimant can do despite the physical and mental limitations that affect what he can do in a work setting.  § 416.945(a)(1).  If the claimant cannot perform his past relevant work, the ALJ proceeds to the fifth step to determine whether the claimant can perform any other work available in the national economy in light of his RFC, age, education, and work experience.  § 416.920(a)(4)(v).  The claimant is entitled to supplemental security income if he is unable to perform other such work.  The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

In the present case, the ALJ determined that the plaintiff was not performing substantial gainful activity and had the severe impairment of "anti-social behavior." [Tr. 9-10] The ALJ then determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. [Tr. 10-11] The ALJ found that the plaintiff had the RFC "to perform medium work . . . except that he is limited to a low stress job that is defined as having only occasional decision making. He must be reminded of tasks four times per day. He must have no interaction with the public and only occasional interaction with coworkers. His work must be isolated with only occasional supervision." [Tr. 11-14] The ALJ determined that the plaintiff had no past relevant work but could perform jobs such laundry laborer, laundry worker, and laundry machine tender. [Tr. 14-15] The ALJ accordingly concluded that the plaintiff was not disabled. [Tr. 15]

## III. STANDARD OF REVIEW

Following the denial of a supplemental security income claim, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see also 42 U.S.C. § 1383(c)(3). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. . . . Substantial evidence means more than a mere scintilla. It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g); see also 42 U.S.C. § 1383(c)(3).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

## IV. DISCUSSION

In the present case, the plaintiff argues that the ALJ improperly (1) gave insufficient weight to a medical statement from his treating physician, Dr. Mustapha Kemal, (2) assessed the plaintiff's credibility, and (3) formulated a hypothetical scenario for the vocational expert's consideration.

### A. The ALJ's Evaluation of Dr. Kemal's Statement

The plaintiff contends that the ALJ failed to give proper weight to Dr. Kemal's "medical statement concerning personality disorder for Social Security disability claim."  [Tr. 420-22]  Dr. Kemal began treating the plaintiff on February 4, 2008 and completed the statement on July 15, 2009.  [Tr. 339, 422]  In his statement, Dr. Kemal indicated that the plaintiff exhibited "persistent disturbances of mood or affect" and "impulsive and damaging behavior."  [Tr. 420]  According to Dr. Kemal, the plaintiff was moderately restricted in his

activities of daily living; had marked difficulty in maintaining social functioning; had deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and experienced repeated episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw or to experience an exacerbation of his signs and symptoms.  [Tr. 420-21]

Dr. Kemal also rated the plaintiff in twenty abilities relevant to employment. Dr. Kemal opined that the plaintiff was not significantly impaired in only two of those abilities, which involved understanding, remembering, and carrying out short and simple instructions.  [Tr. 421]  Dr. Kemal rated the plaintiff moderately impaired in nine abilities:  remembering locations and work-like procedures; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places and using public transportation; and setting realistic goals or making plans independently of others.  [Tr. 421-22]

Dr. Kemal rated the plaintiff markedly impaired in six abilities: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; accepting instructions and responding appropriately

to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. [Tr. 421-22] Dr. Kemal rated the plaintiff as extremely impaired in three abilities: maintaining a schedule, regular attendance, and being punctual; working in coordination and proximity with others without becoming distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. [Tr. 421] On June 15, 2009, one month before completing the statement at issue, Dr. Kemal noted: "I would recommend that the [plaintiff] apply for Social Security disability benefits. I have serious reservations in his ability to be gainfully employed because of his cognitive limitations." [Tr. 419]

The ALJ noted that Dr. Kemal's statement "would essentially preclude any type of competitive work" for the plaintiff. [Tr. 13] Although Dr. Kemal treated the plaintiff, the ALJ determined that the statement was entitled to "little weight" because it was "inconsistent with the record as a whole." [Tr. 14] The ALJ explained that "[t]he medical record demonstrates few concentration, memory, or overall cognitive deficits despite the [plaintiff's] allegations to the contrary. Dr. Kemal does not address how the [plaintiff's] mental functioning could apparently worsen over twenty years after his head injury. No other medical source has reported that the [plaintiff] is limited to this degree." [Tr. 13-14]

The plaintiff argues that the ALJ failed to follow the treating physician rule when he weighed Dr. Kemal's statement. The treating physician rule generally

directs the ALJ to "give more weight to opinions from [the plaintiff's] treating sources . . . . If [the ALJ] find[s] that a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight. When [the ALJ does] not give the treating source's opinion controlling weight, [the ALJ considers several] factors . . . in determining the weight to give the opinion." 20 C.F.R. § 416.927 (d)(2). Those factors are (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) whether the opinion is supported by relevant evidence such as medical signs and laboratory findings, (4) whether the opinion is consistent with the entire record, (5) whether the treating source is a specialist in the relevant area, and (6) any other factors that support or contradict the opinion. §§ 416.927(d)(2)(i) through (d)(6).

In support of his argument, the plaintiff cites other evidence in the record that he claims is consistent with Dr. Kemal's statement. The Court therefore examines this evidence in order to determine whether the ALJ properly weighed Dr. Kemal's statement.

### 1. Comparison with Dr. Delaney's Evaluation

The plaintiff first cites the neuropsychological evaluation completed by Dr. Richard Delaney at Dr. Kemal's request on May 28, 2008. [Tr. 334-36] Dr. Delaney observed that the plaintiff was "alert and appropriate," "pleasant and

cooperative," "participat[ed] with good motivation and effort," and "occasionally show[ed] mild frustration." [Tr. 335] Dr. Delaney then assessed the plaintiff's abilities in several areas. As to attention and mental control, Dr. Delaney found that the plaintiff was "able to focus on tasks and to follow basic directions without confusion." [Tr. 335] However, the plaintiff "struggl[ed] with working memory" and his sustained concentration was "uneven," indicating that he had "susceptibility to distraction over time." [Tr. 335] Dr. Delaney found "moderate mental slowing," "significant deficits in executive functioning," and "at least mild impulsivity." [Tr. 335]

As to perceptual and motor control, Dr. Delaney determined that the plaintiff had "low average pace and coordination." [Tr. 335] The plaintiff's visual scanning ability was "slow but complete," and it was especially slow in complex tasks. [Tr. 335] Similarly, the plaintiff struggled with complex tasks testing his perceptual recognition and analysis, but he nonetheless obtained a "reasonably accurate" result. [Tr. 335]

As to cognitive and intellectual functioning, Dr. Delaney found that the plaintiff had average ability in basic reading and a "low average range of general adaptive abilities." [Tr. 335] The plaintiff's verbal IQ was 76, which is the fifth percentile; his performance IQ was 91, which is the twenty-seventh percentile; and his full scale IQ was 81, which is the tenth percentile. [Tr. 335] The plaintiff had very low scores in verbal comprehension, working memory, and processing speed, while his score in perceptual organization was average. [Tr. 335] Dr.

11

Delaney explained that "weaknesses are observed for all tasks associated with education (fund of knowledge, vocabulary, and mental arithmetic) as well as tasks involving concentration or mental speed." [Tr. 335] Furthermore, the plaintiff was below average in conceptual logic, social awareness and judgment, and categorical reasoning. [Tr. 335] The plaintiff's performance on one of Dr. Delaney's tests suggested "executive dysfunction and cognitive decline." [Tr. 336]

As to learning and memory, Dr. Delaney determined that the plaintiff had "a mildly reduced profile for memory functioning. . . . [O]verall the results of tasks involving learning and memory indicate significantly slowed and reduced learning and additional mild problems with retrieval after a delay." [Tr. 336] Finally, as to speech and language, Dr. Delaney did not find any significant deficits. [Tr. 336]

In summarizing his conclusions, Dr. Delaney wrote that the plaintiff "demonstrates significant weaknesses in sustained concentration, mental speed, and executive control. He functions in the low average range of intellectual capability, especially reflecting low education, and he demonstrates low normal to mildly impaired learning and memory skills. It is most probable that his injury resulted in significant cognitive decline from which some recovery occurred. However, it is also likely that, while judgment and executive control were not strengths prior to his accident, the injury resulted in a worsening in these areas. . . . [H]is behavior dyscontrol is not simply due to his accident/injury but more

likely represents an exacerbation of pre-existing problems." [Tr. 336] Dr. Delaney also noted that the plaintiff "was able to maintain good efforts and engagement over [the] lengthy and demanding assessment" that Dr. Delaney conducted. [Tr. 336]

The ALJ's decision did not explicitly refer to Dr. Delaney's evaluation and therefore did not compare it to Dr. Kemal's statement, as the plaintiff urges the Court to do. In determining whether Dr. Delaney's evaluation is consistent with Dr. Kemal's statement, the Court focuses on the reasons cited by the ALJ for giving Dr. Kemal's statement "little weight." [Tr. 14] The ALJ stated that there were "few concentration, memory, or overall cognitive deficits" noted in the plaintiff's medical records. [Tr. 13-14] Dr. Delaney found that the plaintiff was "able to focus on tasks and to follow basic directions without confusion," but he "struggl[ed] with working memory" and his sustained concentration was "uneven." [Tr. 335] The plaintiff had "moderate mental slowing" and "significant deficits in executive functioning," which refers to cognition. [Tr. 335] Dr. Delaney further explained that "weaknesses are observed for . . . tasks involving concentration," and the plaintiff had "a mildly reduced profile for memory functioning." [Tr. 335-36] The plaintiff's performance on one of Dr. Delaney's tests suggested "executive dysfunction and cognitive decline." [Tr. 336] Therefore, Dr. Delaney's evaluation clearly identified some concentration, memory, and cognitive deficits and described them as "significant." [Tr. 336] Whether these deficits were few in number, as the ALJ characterized them, is not

13

as clear.

The ALJ also questioned Dr. Kemal's statement on the issue of whether the plaintiff's "mental functioning could apparently worsen over twenty years after his head injury."  [Tr. 14]  Dr. Delaney's evaluation addressed this issue, opining that the plaintiff's cognition had improved somewhat since the injury while his judgment and executive control had worsened.  [Tr. 336]  Overall, the portrayal of the plaintiff in Dr. Delaney's evaluation was not as severe as in Dr. Kemal's statement.  Dr. Delaney did not determine that the plaintiff was so restricted that he would be completely unable to work.  The Court concludes that Dr. Delaney's evaluation was inconsistent with Dr. Kemal's statement.  Dr. Delaney's evaluation therefore supports the ALJ's finding that "[n]o other medical source has reported that the [plaintiff] is limited to [the] degree" indicated by Dr. Kemal.  [Tr. 14]

## 2. Comparison with Dr. Weinick's Evaluation

The plaintiff also argues that the evaluation completed by Dr. Howard M. Weinick, a clinical psychologist, was consistent with Dr. Kemal's statement.  [Tr. 217-19]  Dr. Weinick performed a consultative examination of the plaintiff at the Commissioner's request on July 20, 2007.  Dr. Weinick diagnosed the plaintiff with "adjustment disorder with mixed emotional features" and "dependent personality disorder."  [Tr. 217, 219]  Dr. Weinick assigned him a global assessment of functioning score of 60, indicating moderate symptoms of mental impairment, such as flat affect and circumstantial speech or occasional panic attacks, or moderate difficulty in social or occupational functioning, such as

having few friends or conflicts with peers or coworkers.  [Tr. 219]

Dr. Weinick reported that the plaintiff "relates warmly, maintaining eye contact.  He is articulate.  Thought processes are logical, organized, with no evidence of hallucinatory or delusional thinking, or of a thought disorder."  [Tr. 218]  The plaintiff's IQ scores were "at the low range of low average functioning.  His endowment may well have reached average levels, but limited formal education may well account for his [low] verbal" score.  [Tr. 218]  He scored low on the information, arithmetic, and vocabulary tests but had "close to average non-verbal functioning" and average visual-motor skills, logical thinking, and awareness of essential environmental detail and nuances.  [Tr. 218]  There were "[i]mmediate memory difficulties" but no impairment of visual-motor perceptual coordination.  [Tr. 218-19]  Dr. Weinick wrote that the plaintiff showed "imaginative skills," that he perceived the world as "victimizing and ominous," and that he saw himself as "weak [and] vulnerable."  [Tr. 219]  Dr. Weinick noted that the plaintiff was not a malingerer and concluded that he "should obtain a GED, and become aware of his remaining skills, to allow for occupational endeavor."  [Tr. 219]

After reviewing Dr. Weinick's evaluation, the Court determines that it was inconsistent with Dr. Kemal's statement.  Dr. Weinick indicated that the plaintiff's mental impairment was moderate and his abilities were average or below average.  Dr. Weinick advised the plaintiff to pursue his education and an occupation.  [Tr. 219]  There was no indication in Dr. Weinick's evaluation that the

plaintiff was so restricted as to preclude all employment.  Dr. Weinick's evaluation, like Dr. Delaney's evaluation, therefore supports the ALJ's finding that Dr. Kemal's statement stood alone in the severity of its assessment of the plaintiff.

### 3. Comparison with Dr. Hanson's Reports

The record contains further evidence requiring the Court to uphold the ALJ's determination.  Dr. Gregory Hanson, a medical consultant retained by the Commissioner to review the plaintiff's medical records, completed a psychiatric review technique form on July 26, 2007.  [Tr. 220-33]  Dr. Hanson reported that the plaintiff suffered from organic mental disorders because he had a memory impairment, perceptual or thinking disturbances, and emotional lability and an impairment in impulse control.  [Tr. 221]  Dr. Hanson also found that the plaintiff had the affective disorder of depressive syndrome characterized by sleep disturbance, psychomotor agitation or retardation, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  [Tr. 223]  In rating the plaintiff's functional limitations, Dr. Hanson found mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  [Tr. 230]

Dr. Hanson then assessed the plaintiff's mental RFC, rating him in the same twenty abilities that Dr. Kemal had considered.  [Tr. 234-37]  Dr. Hanson judged the plaintiff to be not significantly limited in fifteen of the abilities and

moderately limited in the remaining five abilities, which involved understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and setting realistic goals or making plans independently of others. [Tr. 234-35] Dr. Hanson's ratings starkly contrasted with those of Dr. Kemal, who found two insignificant impairments, nine moderate impairments, six marked impairments, and three extreme impairments. [Tr. 421-22] Dr. Hanson's evaluation was consistent with those of Dr. Delaney and Dr. Weinick in that it identified mild and moderate limitations.

### 4. Comparison with Gaylord Records

In the plaintiff's final attempt to challenge the weight given to Dr. Kemal's statement, he contends that the statement was consistent with the records from his treatment at Gaylord in 1987. However, as the Court explained in the first part of this opinion, Gaylord staff gave the plaintiff a good prognosis. Dr. Belanger, the neuropsychologist, expected that the plaintiff would be able to perform unskilled labor within one year after his accident, to resume his social functioning, and to pursue competitive gainful employment at the lower end of the job market. [Tr. 365] Lauretano, the social worker, noted that the plaintiff had great potential but was unwilling to pursue vocational opportunities. [Tr. 361] These records do not bolster Dr. Kemal's statement. Because that statement was

17

more extreme than the evaluations of the other physicians, it was inconsistent with all of the other evidence, and the ALJ properly assigned it little weight.

In summary, "the opinions of nonexamining sources [may] override treating sources' opinions provided they are supported by evidence in the record." Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995). In the present case, the ALJ considered the medical evidence and reasonably determined that Dr. Kemal's opinion was inconsistent with the less dire opinions of all of the other experts, thus meriting little weight. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (treating physician's key medical opinions not entitled to controlling weight due to inconsistencies with other experts' opinions). The plaintiff argues that the evidence is consistent with Dr. Kemal's opinion, but the issue here is whether the ALJ's findings are supported by substantial evidence, not whether a reasonable person could make different findings. See Carvey v. Astrue, 380 Fed. Appx. 50, 51 (2d Cir. 2010). The ALJ is responsible for weighing the evidence and resolving conflicts. See Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001); Rutkowski v. Astrue, 368 Fed. Appx. 226 (2d Cir. 2010). Substantial evidence supports his determination that Dr. Kemal's opinions were not entitled to significant countervailing weight.

## B. The ALJ's Assessment of the Plaintiff's Credibility

The plaintiff next challenges the ALJ's assessment of his credibility. The ALJ determined that the plaintiff was "not fully credible" because the medical evidence did not support his testimony regarding his mental impairments. [Tr.

13]  Noting that the plaintiff had not sought treatment from 1987 to 2007, the ALJ questioned how the plaintiff's condition could have worsened in the twenty years between his recovery from his car accident and his application for supplemental security income.  [Tr. 13]  The plaintiff now argues that the ALJ improperly considered his testimony and his girlfriend's testimony, his activities of daily living report, his work record, and his explanation for the twenty-year gap in medical treatment.

The assessment of a witness's credibility is entrusted to the ALJ because the ALJ has the opportunity to observe the demeanor of the witness.  Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).  As to the credibility of the claimant's complaints of symptoms, the ALJ first determines whether the claimant suffers from an underlying medical impairment that could reasonably be expected to cause the alleged symptoms.  20 C.F.R. § 416.929(b). If so, the ALJ considers the objective medical evidence and other evidence of symptoms, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; (5) treatment to relieve the symptoms, other than medication; (6) any measures the claimant has used to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions relating to the symptoms.  §§ 416.929(c)(2) through (c)(3).

The ALJ must evaluate the claimant's statements about the intensity,

persistence, and limiting effects of his symptoms in light of the objective medical evidence and any other evidence.  § 416.929(c)(4).  The ALJ must consider whether there are any inconsistencies within the claimant's statements or conflicts between the claimant's statements and the evidence.  § 416.929(c)(4).  When the claimant's statements are internally consistent and consistent with the evidence, there is a strong indication that the claimant is credible.  Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *5-*6.  The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Id. at *4.

In the present case, the plaintiff testified at the ALJ hearing that he does not feel depressed "every day, but at times . . . I get my case of depression to kick in and . . . I don't want to know nothing. . . .  I don't want to be around anybody.  I just want to be left alone."  [Tr. 26]  When asked how he deals with stress, the plaintiff answered:  "Probably not too good. . . .  I get stressed out about maybe things I shouldn't be stressed out about . . . ."  [Tr. 42]  He gave an example of his trouble with concentration:  "I can watch a movie, but I have to sit there.  If I get up and walk away from it, no good.  I got to stay focused on the picture . . . because if I miss a part, forget it.  I'm done with the movie."  [Tr. 44]  The plaintiff reported having some sleep disturbances:  "I'll sleep maybe two hours a night, sometimes . . . maybe an hour . . . sometimes I'll sleep a full night, but most of the

time I'm up. . . .  I'll watch TV until I fall asleep."  [Tr. 26]  He testified that he

"stay[s] away from the alcohol," but he admitted having "one or two beers" "a

couple weeks" before the hearing.  [Tr. 30, 32]

When asked whether he socializes with family and friends, the plaintiff

stated:  "[W]hen I need to, I do."  [Tr. 28]  He elaborated:  "I keep to myself a lot.

. . . I don't like crowds."  [Tr. 28]  The plaintiff stated that he lives with his

girlfriend in her home with three other adults, and he performs chores such as

cooking.  [Tr. 29, 38]  On a typical day, he awakens at 7 a.m. or 8 a.m. and

eventually leaves the house.  [Tr. 29-30]  He testified:  "I'll go out and . . . see

what's happening. . . .  I'll take a walk. . . .  Or I'll call somebody to see what

they're doing for the day, if we can get involved in doing some kind of activity.

Most of the time I stay home."  [Tr. 30]  The plaintiff stated that he works on

vehicles as a hobby:  "I have an El Camino that I'm trying to put back together."

[Tr. 28]  When asked how long he had been working on it, however, he answered:

"[T]he car was given to me two years ago.  I haven't done anything on it.  It's

parked at the side of my house covered with a tarp. . . .  I need a motor for it."  [Tr.

29]

As to the plaintiff's decision to quit school after the seventh grade, he

testified:  "I probably started working when . . . I was younger.  It might have been

attitude — bad attitude . . . .  I don't know the reason why. . . .  I think I just walked

out one day and that was it.  I didn't go back."  [Tr. 36]  As to his work history, he

testified that he had a job as a flagger with a construction crew, but he had to

give it up due to a lack of transportation.  [Tr. 22-23]  He also worked as a mechanic at a repair shop.  [Tr. 23-25]  He had a job stacking newspapers at night, but the job ended when he "got in trouble and then got locked up . . . ."  [Tr. 33-34]  The plaintiff worked as an assistant to a roofing crew, but that job also ended:  "I left the job because there was going to be a scuffle between me . . . and an employee on the job because he got mouthy . . . .  I walked off the job because I would have hurt him."  [Tr. 34]  The plaintiff had some brief jobs in which he earned "money for a pack of cigarettes or something like that, a couple dollars."  [Tr. 36]  When asked why he had not worked long term, he stated:  "I don't know. . . . [M]aybe I didn't want to or . . . it might have been some of the information that I didn't have to put down on the application is probably why I didn't do it that way."  [Tr. 36]

The plaintiff described a job that he obtained at Jiffy Lube through the Connecticut Department of Social Services, Bureau of Rehabilitation Services:  "I went down to Jiffy Lube . . . .  There was no cars inside the place.  No cars on the parking lot.  I says '[W]ell, what's everybody doing?' . . .  [The manager] says, '[W]e want you to go out there and hold [a] sign [advertising our services].' . . . [H]e goes, '[E]verybody here has to hold the sign.'  I says, '[B]ut not I.  I'm not holding the sign.  I came here to do some work and not stand out in the middle of the road holding a sign. . . .  [L]et [someone else] hold the sign.  If you have no work for me, I'm going to go home,' and I left."  [Tr. 41-42]  The Bureau of Rehabilitation Services refused to assist the plaintiff in gaining employment after

that episode due to his "attitude and apparent lack of motivation." [Tr. 42, 378]

The plaintiff further testified that he would not be able to fix cars at a repair shop for eight hours per day, five days per week because he has a problem with authority: "[B]ecause they'll tell you, you got to do this and you have to do this, and people, they snap at you. I snap right back, so we don't get along. . . . I may have an attitude problem, [but] a lot of other people . . . definitely . . . have problems also." [Tr. 43] The plaintiff acknowledged, however, that he had not "snapped" since he began taking medication: "[T]he medication keeps me level-headed, so I don't snap and blurt things out and act like I'm not supposed to act." [Tr. 42] Social Security records show that the plaintiff's total lifetime earnings from ten jobs are less than $10,000. [Tr. 129-31]

The plaintiff's girlfriend, Anna Carlson, testified that she helps the plaintiff to pay his child support, to keep track of his medical appointments, to remind him to take his medication, and to complete paperwork. [Tr. 48, 51] She stated that the plaintiff performs yard work and washes dishes but is "very distracted" and "loses track." [Tr. 48-49] Carlson summed up her view of the plaintiff: "He's a great guy. . . . [H]e just can't do the paperwork . . . . I just feel totally bad for him." [Tr. 51, 53]

In addition to the testimony of the plaintiff and Carlson, the record contains an activities of daily living report in which the plaintiff indicated that he can shop for food, prepare meals daily, perform "light lawn work," do "some painting," "pick up after [him]self," and do the laundry. [Tr. 145-47] He indicated that he

23

does not need help or reminders to take his medication. [Tr. 144] He also reported that he "spend[s] time with others" "play[ing] pool [and] just hang[ing] out and talk[ing]" on a daily basis. [Tr. 148] To the question whether he had "any problems getting along with family, friends, neighbors, or others," he answered: "No." [Tr. 148] To the question of how well he "get[s] along with authority figures (for example, police, bosses, landlords or teachers)," the plaintiff answered: "No problem." [Tr. 149] However, when asked to place a checkmark next to the abilities affected by his impairments, the plaintiff wrote "sometimes" under "getting along with others," but he did not place a checkmark next to that option. [Tr. 148] When asked for how long he could pay attention, the plaintiff answered: "If it interest[s] me I will pay attention, if not I don't." [Tr. 149] Carlson noted on the report that the plaintiff lacked insurance. [Tr. 150]

The Court's summary of the testimony and other evidence relating to the plaintiff's credibility reveals substantial evidence supporting the ALJ's assessment. There are numerous inconsistencies casting doubt on the plaintiff's claim that his anti-social behavior prevents him from working. The plaintiff testified that he keeps to himself and stays home most of the time, but he wrote on his activities of daily living report that he spends time with others playing pool, hanging out, and talking on a daily basis. [Tr. 28, 30, 148] He lives with his girlfriend in her home along with three other adults and performs chores. [Tr. 29, 38, 145-47] He indicated that he does not need to be reminded to take his medication, but Carlson testified otherwise. [Tr. 51, 144] The plaintiff testified

24

that he stays away from alcohol, but he admitted having "one or two beers" "a couple weeks" before the ALJ hearing.  [Tr. 30, 32]  He stated that he was working on his El Camino but then admitted that he had not done any work on it after all in the two years since it was given to him.  [Tr. 28-29]  The plaintiff testified that he cannot tolerate authority, but he indicated on his report that he has no problem with authority figures such as bosses.  [Tr. 43, 149]  He also indicated on that report that he has no problems getting along with family, friends, neighbors, or others.  [Tr. 148]  When asked why he had not worked long term, he stated: "[M]aybe I didn't want to . . . ."  [Tr. 36]

In addition to these inconsistencies, the Court examined the objective medical evidence earlier in this opinion and concluded that the majority does not support the plaintiff's claim that he is completely unable to work.  As to the plaintiff's twenty-year gap in treatment, the ALJ did not mention the plaintiff's lack of insurance as an explanation for the gap, and the plaintiff did little to advance his explanation.  The only reference to this explanation cited by the plaintiff is Carlson's brief notation on the activities of daily living report.  [Tr. 150] The ALJ was nonetheless aware of the plaintiff's very limited work history and lifetime earnings of less than $10,000.  Therefore, his inability to afford insurance would not be particularly remarkable and would not outweigh all of the other evidence supporting the ALJ's assessment that the plaintiff was "not fully credible."  [Tr. 13]

The plaintiff also argues that the ALJ failed to consider his sporadic work

record.  "Just as a good work history may be deemed probative of credibility, poor work history may prove probative as well. . . .  A claimant's failure to work might stem from [his] inability to work as easily as [his] unwillingness to work. Therefore, a consideration of work history must be undertaken with great care. An ALJ should explore a claimant's poor work history to determine whether [his] absence from the workplace cannot be explained adequately (making appropriate a negative inference), or whether [his] absence is consistent with [his] claim of disability."  Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998).  In the present case, the plaintiff contends that his poor work history as reflected in his earnings record, combined with his testimony regarding losing jobs following confrontations with supervisors or coworkers, is the result of his anti-social behavior.  The record is replete with references to, and the ALJ in fact did recognize, the plaintiff's sparse and sporadic work history.  [Tr. 14]  The record also includes the plaintiff's admissions that his official work history does not include all of his actual work history because he held some jobs "under the table" and failed to report the income.  [Tr. 23]  These admissions clearly further undermine the plaintiff's credibility.

C. The Hypothetical Scenario Presented to the Vocational Expert

The plaintiff's last argument is that the ALJ presented a flawed hypothetical scenario to the vocational expert, Renee Jubrey, who testified at the hearing.  The ALJ asked Jubrey to consider a person requiring a low-stress job involving occasional decision-making, an isolated environment, no interaction with the

26

public, occasional interaction with coworkers, and occasional supervision including being reminded of tasks four times per day.  [Tr. 55-56]  Jubrey then testified that the hypothetical person could work in a laundry, for example in a hospital, and the ALJ relied on that testimony in his decision.  [Tr. 11-14, 56, 60]

The plaintiff contends that occasional supervision is inconsistent with being reminded of tasks four times per day.  However, the plaintiff fails to cite any evidence in the record or general standards in support of his view.  Jubrey testified that her understanding of the meaning of "occasional" is up to two hours in an eight-hour workday.  [Tr. 60]  Four reminders would clearly not consume two hours.  Jubrey testified that the reminders would occur as follows:  "First thing in the morning this is what you need to do.  Come back from break time, this is what you need to do.  Lunchtime come back, this is what you need to do . . . ."  [Tr. 58]  Jubrey also testified that a laundry environment is "so routine . . . within a week you're just doing the same thing over and over and over again.  The supervisor may walk through the department, but I'm not sure there's a lot of interaction."  [Tr. 59]  The plaintiff suggests that he would not be able to tolerate a supervisor who gave him four reminders every workday, but the Court has already discussed the plaintiff's inconsistent statements regarding authority figures and concluded that the ALJ properly found him to be not fully credible.

The plaintiff also contends that a laundry environment would include more than occasional interaction with coworkers because Jubrey testified that the coworkers would be located ten to fifteen feet away.  [Tr. 62]  Jubrey also testified

that "on a daily basis you're either going to pass [coworkers] at the time clock or generally see them.  You don't necessarily have to interact with them . . . .  If you want to be left alone, you can be left alone.  If you want to interact with other people, there's an opportunity you can do that on your break."  [Tr. 61-62]  The Court determines that the plaintiff's argument is not supported by Jubrey's testimony.  The ALJ properly relied on that testimony to find that the plaintiff was able to work in a laundry.

## V. <u>CONCLUSION</u>

The record indicates that the ALJ's findings are supported by substantial evidence and based on the correct legal standards.  The plaintiff's motion to reverse and to remand [Doc. #13] is DENIED, and the Commissioner's motion to affirm [Doc. #18] is GRANTED.  The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  December 7, 2010.